Good morning, Your Honors. May it please the Court, I am William Jay for the Appellants. The preliminary injunction here rests on a misreading of the key contract term, and it also misunderstands the irreparable harm case law. Now, either one of those legal errors would be a basis to reverse, and I'd like to touch on each of them, but I'd like to be no likelihood of success under the correct contract interpretation on the ownership claim. Our argument really is grounded in the text of the product development scope. I'd just like to begin with a couple of sentences of context, though, and that is that my clients, Mr. Young and Mr. Hewitt, were ready to leave Sleep Number. Sleep Number wanted them to stay around for a transition period, and that's where this agreement comes from. It freed them to engage in their own venture. It even allowed them to compete with Sleep Number as long as it was outside the product development scope. So this isn't a non-compete agreement. This was the terms on which they could be operating their own venture. So everything turned on the product development scope. The work they wanted to do with their new venture would not use the same kind of mattress-based sensor as Sleep Number, or the work they'd done there, and it did not focus on sleep. That is why the product development scope reads the way that it reads. So it gives Sleep Number ownership of ideas relating to mattresses and ideas relating to bedding, ideas related to sleep, but it does not give them ownership over beds. That really is the crucial omission from the product development scope, and it's the crucial error that the district court made in reading the contract here. I don't know. I was amazed. I thought that this whole focus on bed was a red herring because it says sleep, and biometric sleep monitoring. Well, generally, one doesn't monitor sleep standing up. It doesn't even mention bed. It mentions bedding, but the whole focus on bed I thought was a red herring. Well, I mean, the district court made clear that it thought that any patent application that had a picture of a bed in it, that that was owned by Sleep Number, and that fell within the product development scope, even though there are many applications of beds that do not relate to sleep, and I'd just like to begin with the first sentence of the... Of course, but how is a biometric monitoring system that can, doesn't have to be, but can be used when one is sleeping, how does that not relate to sleep? It doesn't relate to sleep because it's not monitoring sleep per se. It's engaging in the kind of cardiac or respiratory monitoring that could be done in a doctor's office while the patient is awake. It can be done in a nursing home or a hospital setting while the patient's... Your argument is that's not sleep monitoring? Yes, that's right, that when you have, for example, a patient that's confined to a bed, and the first sentence of the 613 application says that that application is intended for use in a medical setting. When you have a patient confined to a bed, that this technology can be used to tell caregivers when the patient's at risk of bed sores, they need turning, and it can monitor their weight gain if there is suffering from congestive heart failure or COPD over a period of time. That is not sleep monitoring, no. Presumably, someone who's limited to their bed, bedridden, would sleep in the bed and the monitoring would occur overnight during sleep too. Isn't that related then to sleep? I take the point and I want to answer it directly. I just note parenthetically that that wasn't the district court's reasoning, but to take that square on, because I think that is the thrust of the other side's argument, that anything that can be done at night while the patient's in the bed, that relates to sleep. I don't think that's how you can read this agreement, especially given the omissions and the carve-outs. Let me illustrate that with another example. There are many things that can be done in a bedroom that don't fall into the scope of bedroom technology. You can certainly use a cell phone in a bedroom. You can use a remote control in a bedroom. Those aren't bedroom technology. I think the same sort of interpretive principle applies here when you're talking about the relation to sleep. If something can be done whether the person being monitored is awake or asleep, then it's indifferent to sleep. It doesn't relate to sleep. It's not sleep monitoring. I thought that was a terrible argument, too. Being indifferent to whether one's sleeping or not doesn't mean that it doesn't also relate to sleep. You kept saying, your brief kept saying substantially relates to. I didn't see that term in there. Substantially is not in there. It's a very broad relates to.  Okay. So why the indifferent, if it's indifferent but it can monitor sleep, then surely it relates to sleep monitoring. I don't think that that's right, Your Honor, because even taking some of the cases that interpret the term relates to and that the other side relies on for the notion that relates to is a broad concept. It says relates to ordinarily means having a connection with or a reference to, right? And so a system that I assume it's going to monitor breathing and heart rate when one is asleep. When one is awake or asleep, I think, yes. Okay. I'll grant you that. But surely if it can do it while you're sleeping, it relates to sleep. I mean, I think that's fundamentally the proposition with which we disagree, right? Okay. Well, you're going to have to persuade me because I'm not seeing that. I understand, Your Honor. So let me take it in three steps. And the second and third are points that I think that even if you don't agree with me about the contract interpretation, then you may agree with me that the injunction should be reversed for either the second or third reason. I think your irreparable harm argument is better, but I'd like to hear that, too. Right. And that's the third. The second is the temporal, kind of the temporal connection about when the sleep aspect comes into this. And really the first point is just to ask you to look at the 613 provisional application, which is the only application that's actually filed during the term of this agreement. The word sleep doesn't appear in it at all. And it explains, starting from the first sentence, that it's intended for use in a medical setting. When you look at the beds, the beds have — many of the beds have wheels, and if you look at the drawings, many of the people are awake. So that really is the illustration. Is there a subset of monitors that can only be used during sleep? So I don't think that this type of monitor could only be used during sleep, but I'm sure there is — I'm certain there is monitoring technology that is geared to monitoring things that happen during sleep, such as rapid eye movement or, you know, brain activity, something like that. But that's exactly the point, that the technology that uses very subtle shifts in weight across the four corners of whatever substrate you're lying on to determine your breathing and your heart rate and weight shifts and weight gain, those are not aimed at anything having to do with sleep, precisely because your heart is beating whether you're awake or asleep. Your doctor or your caregiver may want to know that heart rate or weight or position information, again, whether you're awake or asleep. So the second point is the temporal one, and I'm just going to touch on that briefly, which is that the district court did not look at whether any of these inventions were actually part of the time period of the agreement. It just relied on the priority date, but the court itself acknowledged in footnote three that one of the patent applications does not relate back in full to the original date, and it didn't even look at what was claimed in that application to determine where the idea came from. It just relied on the partial priority date. I do want to move to the irreparable injury point as well, because on that point, I think the district court fundamentally misread the case law that the other side cited, both there and here. Now, our submission really is a simple one, that the district court viewed any office action, the opportunity to respond to any office action, as something that would irreparably harm sleep number if sleep number were not able to control that response. That's not based on anything in the case law, and it's certainly not based on anything in the record, because when two parties are fighting over ownership of a patent, they both have the same — until the ownership claim is resolved, they both have at least the same interest in obtaining successful issuance of the patent. Let me ask you this, though, because I think the district court was colored a little bit by the fact that your client tried to disassociate the 613 application, which occurred during the relevant timeframe that would have been protected by the contract, from the later applications that may or may not have grown out of that. Why wouldn't it be reasonable for the district court to think your clients were trying to pull a fast one there, and therefore, we needed an injunction to stop that kind of thing from happening in the patent office going forward? Of course, I'm going to resist the premise about pulling a fast one, but I think your question really gets to, you know, isn't there a risk that something could happen that would, in fact, prejudice the number? Well, and isn't there some evidence that, at least arguably, one could infer that there was some shenanigans going on? So there are two points I'd like to make in response to that. I mean, one is just about priority dates and how they work in the patent system, that surrendering a claim to an earlier priority date is not a bad thing if it doesn't result in prior art coming in in between the earlier date and the later date. And it can actually be a very good thing, because if you claim too far back, you wind up sacrificing part of the term of the patent. So in other words, if you move your priority date six months into the future, you're going to get a patent six months further into the future. So even if you — even granting the premise, which of course we don't grant, that a disclaimer of a claim of priority could be, you know, motivated by litigation conduct or whatever, they still haven't shown any actual harm either from the past one or from a hypothetical recurrence of it, because what they haven't shown is that changing the priority date from the one date to another six months later caused any kind of risk of invalidation or made — is even going to make prosecution in any way more difficult. And this really is — goes to what they submitted to the district court, which was case law rather than evidence. And they — primarily the Fifth Circuit decision in the compact van case. And the real difference between that case and likewise the Hallmark case from the district court that they cite is that in those cases, there was concrete evidence that the — that the person who had control of the patent application at the time was preparing to surrender particular claims and that prosecution was going to come to an end, meaning that there was not going to be an opportunity to fix that. And so that's why, for example, there was an injunction in one of these cases directing much more limited relief than here, saying, please file a continuation application that just holds prosecution open so that once we figure out who the right owner is, nobody will be harmed. That's much more burdensome — much less burdensome than the injunction here, which says not only no prosecution, but you can't even file any new patent applications. I see that I'm into my rebuttal time, unless the Court has any further questions at this time. Mr. Hanson? Morning. May it please the Court, Andrew Hanson on behalf of Sleep Number. This — this appeal comes at a point in this case where we are two days from completing discovery, hopefully. This injunction was filed at the beginning of the case, when discovery was just starting. We've also filed a motion to supplement the record, which was from some I'll talk about that a little bit, but I do want to give a little bit of a background here. The defendants, Mr. Young and Mr. Hewitt, were developers of sleep monitoring technology. They worked for a company, BAM Labs. That company was acquired by Sleep Number. They then worked for Sleep Number to do the same thing for several years before becoming consultants and to continue doing the same thing. They were well paid for this, but instead of developing this technology for Sleep Number, they developed it for the new company they formed, UDP. And when the 613 patent, that I know counsel mentioned earlier, when that provisional application became publicly available in the summer of 2020, Sleep Number realized what they had actually been doing for UDP while they were under the consulting agreements, and this suit was filed. One of the early conferences with the district court, I had mentioned to the district court at some point before office actions are issued on these other applications or shortly before, we are going to have to move for an injunction because the applications themselves, the ownership is in dispute, and we need, if we own them, and we believe we do, we need to be able to prosecute those applications. Well, what would be the effect if the injunction was vacated? Your Honor, office actions have not issued as of this time. The effect is if the injunction was vacated, the appellants in this case would be free to modify those patent applications. We've already seen them do it once. The 613, the priority claims back to that, which are very good evidence for us in this case, that was changed after the case started. They would be free to change other priority claims back to the 623, which was filed, the application of that shortly after the consulting agreements ended. But why isn't that speculative? Why isn't that, you know, this might happen, you know, you got to, it's irreparable harm. So can you articulate a non-speculative? Your Honor, I would say the ability to control the patent prosecution process for something that you own, for an invention that you own, is critical. Do you have a case that says that that creates irreparable harm? Well, I think if the cases we cited, like the Compact case, and we cite three or four other cases along those lines, talk about how it is important for a party to be able to control the prosecution of their own intellectual property, I will agree. And when I was talking to the district court, when I was arguing this motion, I told the district court, there is not a case on point with what is happening here. And almost certainly, without office actions being issued, if no other activity had taken place, there's a good chance we would not have moved for an injunction absent the change in priority on the 613. So Your Honor, I'd say we don't know what's going to happen. That is true. Assuming the worst happens and your opponents pursued the patent, obtained the patent, begin to produce products to apply an application of the patent, yet you would still have your rights to pursue your claim that you are the proper owners, and would you not have the remedy of being able to obtain damages for whatever profits or revenues you were deprived of or could prove based on the taking or the obtaining of your property? There certainly would be the ability to obtain money damages. I don't know if that would completely make Sleep Number whole in that scenario, Your Honor. What I'm more concerned about is the more immediate. Well, you're not sure, but we need a little better than you're not sure. Why wouldn't money damages be sufficient? Because I think it depends on how the patents are actually prosecuted, what the claims come out are, what the motivations behind that were, were claims narrowed, were claims pursued in a way to aid their business and hurt Sleep Number's business. Are you suggesting that the claims might be pursued to affect this litigation? Is that part of your claims too or not? Yes, Your Honor. Claims could be narrowed to affect this litigation. In fact, that's one of the things the district court was concerned about. I think we've already seen that with the priority change, the 613, where that was narrowed. That certainly was a key fact and is a key fact in this case that they claimed priority to that 613 time and time again going out almost two years. Then when this case was filed, they decided they needed to pull it back. And, Your Honor, just to further answer your question, I think the key issue really with the injunction on the harm is does a party who owns a patent application and that's in dispute. They claim they own it. We claim we own it. Does a party who actually owns it have the right to prosecute that application as they see fit? There's an entire legal industry that is dedicated to prosecuting patents. You have to make decisions along the way. How do you write the specifications? How do you write the claims? Do you narrow the claims? How do you deal with prior art? What are the arguments you're making to the examiner? How do you want to structure the claims to benefit your business going forward? Those are the concerns that we raise with the district court. Why is the injunction overbroad here? I mean, my understanding is it enjoins UDP from any patent activities except those that are necessary to preserve pending applications. It seems to me that that brings in people who have nothing to do with this and really puts a clamp down that's not necessarily to protect your rights in this case. I think the, Your Honor, the breadth of the injunction is appropriate in how it deals with the subject matter of the current applications. So we have claims that the conception and ideas that we saw in the 613 application run out to these other applications and they're enjoined from pursuing further prosecution on that. If UDP or anyone wants to pursue other applications, they're free to come to the court and do that. The injunction as it currently stands would cover those, right? I think if it relates to the same subject matter, I'm not necessarily sure it would cover it if it relates to different subject matter. Of course, there's a dispute about what the subject matter is. Well, there's a, I don't think there's a dispute as to what the subject matter is of those applications. I think there's a dispute as to whether, who owns it. Who owns them. Yes. Isn't there also a dispute about the applications because I'm sure their position is they're looking at SIDS monitoring of the potential for treating SIDS in infants and blood pressure concerns for adults that those technologies don't relate to the mattress industry? Well, the carve out in the product development scope for SIDS and for blood pressure monitoring, that carve out is written very narrowly. It doesn't have the broad relating to language as the coverage of the rest of the program. If those applications have anything to do with SIDS, they've managed to write them in a way that never mentions SIDS. If they have to do with blood pressure monitoring, they've And certainly sleep number's position is if those exclusions come into play, the invention itself has to be just for those exclusions. It can't be, oh, this could be for blood pressure monitoring, but it also does 80 other things, sleep biometric monitoring, you name it. It would just have to be blood pressure monitoring. Those applications don't mention it. And, you know, we're far along in discovery now. We haven't seen any documents at the time. I'll just speak to the record of what's before this court. But UDP did not come forward with any documents showing, hey, this is related to blood pressure monitoring or SIDS at the time we pursued the injunction. So there's no documents. There's no mention of them in any of those patent applications. It doesn't talk, this is the field. It doesn't talk about SIDS or blood pressure monitoring. So I think the district court was correct in finding that there's at least a fair chance that these applications do not fall within either of those exclusions. A couple of other things I wanted to mention, speaking of the balance of harms, because I know that UDP has raised the other inventors on some of these applications. Those inventors have no rights. Those applications have all been assigned to UDP. They will remain inventors on those patent applications because they are at least claiming that they invented part of them. It doesn't matter who prosecutes. They would remain inventors. There's simply no harm to those individuals. Once an individual assigns a patent to its employer or somebody else, they lose the ability to control what that patent is done, what is done with it, whether it's how it's prosecuted, how it's enforced, whether it's sold. They simply have no rights. And then finally, I just want to mention on the motion to supplement that we have before the court. I know there's been argument in the briefs and argument here this morning that these inventions don't have anything to do with sleep. Certainly, you can see from that motion that shortly after the employment on the consulting agreements ended, that Mr. Young and Mr. Hewitt and UDP were representing two potential investors, that that's exactly what they were doing. It's sleep biometric monitoring. And there's been a lot of discovery developed since then that even shows that during the period that they were under the consulting agreements. And to respond to Mr. Jay's argument that this technology doesn't have anything to do with sleep, one thing I would say is if you followed that logically, pretty much nothing then would really have to do relate to sleep. Pajamas wouldn't. Pillows wouldn't. Because you use those outside of sleep. You lay down on them when you're awake. You wear pajamas before you're asleep. Blackout shades as a bedroom technology, you could use those during the day, not when you're asleep. It would make an exclusion that would completely overtake the rule. Finally, with the short time I have left, I do want to get back to the threat of irreparable harm for a moment. Because I know that's an issue that this court is definitely concerned with. We did see in November of 2020, after this case was filed, we did see UDP and the two individual defendants go back and change the claim of priority to the 613. Certainly, it smells of litigation gamesmanship. But they did it. And it does impact sleep number. It changes how early that patent would be effective. Other patents would be effective that relate to that 613. And the other thing that allowing UDP to just press ahead and continue to prosecute patents does is essentially would take a competitor of sleep number, have their head of their IP department sit over at sleep number and prosecute sleep number's patents for a while. Of course, that would cause harm to sleep number. If someone else is doing it, someone else gets to make all those decisions. Someone else gets to decide, how do I write up this examiner on this claim? That's the irreparable harm, simply not being able to do that and not being able to make those decisions. If you have no further questions, I can... Of course, what's done is done. You know, what they did with the 613 is done. I don't know. It's hard to say whether it's purely speculative or not that they might do something like that again. Well, and, Your Honor, it's not just whether they would do something like that. I think you know it's the... But, again, it's speculation. They might do lots of bad things, but I don't know that we know... I think it's the right, Your Honor, it's the right to control what is done with what you own. And if, like, we had an issue of, let's just say, if there were... Can I quickly finish this thought?   If we had an issue of, say, ownership of a car and we were... They said they own it. We said we own it. We've got to go to a case, go to trial and figure it out, get a ruling on who actually owns it. In the meantime, you know, just because they have possession of it, I think that's a good argument to make. They can't do anything they want with it. They can't paint it. They can't destroy the interior. There's no way you would get an injunction in that situation because you could get money damages. Unless there was something highly unique about that particular car that it couldn't be replaced, you would get money damages. That's fair, Your Honor. But money damages in this case wouldn't cure how claims get narrowed, how claims get abandoned. Thank you. Thank you, Mr. Hanson. Thank you, Your Honor. Just a few quick points in rebuttal. First, to the overbreadth of the injunction, I'd point you to page 24 of the district court's decision. Defendants, all of them, are enjoined from further patent prosecution efforts, including filing new applications. That's all the defendants, including, so UDP can't even file a new application with inventors other than Young and Hewitt. So let me go to the Chief Judge's question about what would happen if the injunction were vacated. This case is set for trial next fall. So we're not that far away from deciding who owns the patent, patents or patent applications. There are ongoing discovery obligations, even though fact discovery is about to close. And so if there is an office action or if there is communication from the patent office, Sleep Number will know about it, and they will have the opportunity to raise something that is more than hypothetical. But the sort of ineffable right to control prosecution, that's not supported by anything concrete in the facts. It's not supported by anything in the law. In addition to the point about money damages, I would just point the Court to one of the cases that the other side is relying on, which is Ethicon. Ethicon is a post-trial decision. The question was after the Court decided, the jury decided, that the plaintiff owned the patent and the defendant did not, the record owner was the defendant, that the Court granted an injunction, balanced, did the usual four-factor analysis and granted an injunction awarding permanent ownership at the end of the case. That's a far different remedy than what Sleep Number has been able to obtain here. My friend on the other side says that there are judgment calls to be made, there are decisions to be made if there is an office action. Those issues could be raised with the Court if it actually came up. But more to the point, anything like that is fixable. In the very, in the very case that they cite for the, for the proposition that claims that are surrendered can never be gotten back, what the Federal Circuit actually says in that case is that continuation applications or a continued prosecution, you can broaden claims again after you've narrowed them. What you can't do is when you've, when you've told the examiner that you're surrendering particular, particular scope in order to get, in order to get the patent issued, then that's different. But you absolutely can broaden the claims again. So, and any – Counsel, may I ask a quick question here? Did the District Court make any fact findings about the, withdrawing the priority claim back to the 613, about your client's motives or about the District Court's concerns about that? Is there a fact finding at all in the record? I wouldn't call it a fact finding. I think the District Court did base its, the aspect of its decision about time, about whether these inventions date back to the right, to the right time period. I think the District Court did base that on the fact that the, that the priority date was changed. And then for, for irreparable harm, I don't think you can call it a fact finding, because what the District Court didn't do is examine whether there was any harm that actually occurred as a result of that change. It's not contested that the change occurred. What the District Court didn't do was explore that, whether it caused any past injury, whether there was any likelihood that it would recur, and whether that injury would be an irreparable one. Thank you. Thank you, Mr. Yeh. Thank you, Your Honor. Thank you, Your Honor. Thank you.